# IN THE SUPREME COURT OF TEXAS

No. 18-0983

EAGLE OIL & GAS CO., PETITIONER,

v.

TRO-X, L.P., RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

**Argued December 1, 2020**

JUSTICE LEHRMANN delivered the opinion of the Court.

This is the second suit arising out of a joint effort by TRO-X, L.P. and Eagle Oil & Gas Co. to acquire and sell oil-and-gas leases. In the first, TRO-X alleged that Eagle deprived TRO-X of its right to acquire its share of certain mineral interests Eagle retained as part of a sale of the leases. TRO-X lost that suit on appeal when the court of appeals determined that TRO-X "always held" equitable title to those interests and thus had not been deprived of them. *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 416 S.W.3d 137, 149 (Tex. App.—Eastland 2013, pet. denied) (*Eagle I*). TRO-X now alleges in the second suit that Eagle failed to remit to TRO-X its share of income generated from production on the interests that commenced after the conclusion of the trial in the first suit.

The issues presented are whether TRO-X's claims in the second suit are barred as a matter of law by res judicata, waiver, or the statute of limitations. The trial court granted summary judgment for Eagle, but the court of appeals reversed. We agree with the court of appeals that Eagle has not conclusively established the affirmative defenses that are the basis of its summary judgment motion. Accordingly, we affirm the court of appeals' judgment.

## I. Background[1]

TRO-X acquired geological information and findings for the purpose of oil-and-gas exploration in West Texas. In 2005, TRO-X and Eagle entered into two acreage acquisition agreements: the South Haley Agreement, which is not at issue in this case, and the New Prospects Agreement (the Agreement).[2] The Agreement stated that the parties would acquire oil-and-gas leasehold interests in Pecos and Reeves Counties. The interests would be acquired in Eagle's name on behalf of both Eagle and TRO-X, and Eagle would bear all acquisition costs (up to $3 million) during the first year. Eagle and TRO-X could choose to retain a percentage of unpromoted working interests in the prospects, and the remaining interests would be sold to third parties on a promoted basis.[3] If those sales were profitable, they would yield "cash proceeds" consisting of cash payments received from the sales and "non-cash proceeds" consisting of overriding royalties, back-in working interests, and the like. The Agreement provided a formula

---

[1] The history of the parties' dispute is lengthy and complex. Our discussion of the background is limited to the facts relevant to the issues presented.

[2] The New Prospects Agreement is technically an amendment to the South Haley Agreement, but that distinction does not affect our review.

[3] The Agreement defines "unpromoted" to mean "that the chosen working interest shall bear all third[-]party out-of-pocket costs (i) in the acquisition of the Interests, (ii) for geological and geophysical data and analysis, (iii) for running and curing title and title opinions, and (iv) for costs incurred in preparing to drill, drilling, completing, equipping and pipeline costs under the terms of the Prospect Agreements, including operating and overhead charges provided for therein."

2

for dividing the cash and non-cash proceeds between Eagle and TRO-X after they recovered their expenses.

The Agreement included a provision governing an "Area of Mutual Interest" (AMI). Under that provision, the parties could not purchase any interests in the AMI for one year; after that, if one of the parties purchased an interest in the AMI, it was required to notify the other party of the acquisition within five days. The other party then had ten days to notify the acquirer whether it would acquire its share of the interest and pay its share of the costs.

During the first year of the Agreement, Eagle purchased over $10 million in mineral leases covering 80,000 acres in the New Prospects. Pursuant to the Agreement, those interests were acquired in Eagle's name. In April 2007, Eagle sold to Eagle Oil & Gas Partners, LLC (Eagle Partners)—an entity Eagle invested in and managed—an undivided 50% working interest in approximately 32,000 acres in the New Prospects. A dispute arose between Eagle and TRO-X regarding the acreage Eagle purchased, the sale to Eagle Partners, and the applicability of the AMI provision.

In October 2007, TRO-X sued Eagle for breaches of contract and fiduciary duty and sought a declaratory judgment (the Midland suit). In 2008, while that suit was pending, Eagle and Eagle Partners sold a portion of the New Prospect leases to Chesapeake Exploration, LLC in two transactions (the Chesapeake sales), reserving an overriding royalty interest and back-in working interest (the Interests). The trial court, with approval of the parties, ordered an accounting for the purpose of determining the share of the sales' cash proceeds to which TRO-X was entitled. The auditor concluded that TRO-X's share was $1,064,789.45, minus any reimbursement owed to Eagle for certain expenses totaling $685,000.65.

3

TRO-X amended its petition in the Midland suit to incorporate allegations and claims related to the Chesapeake sales. In pertinent part, TRO-X alleged that Eagle breached the Agreement by failing to distribute to TRO-X its share of the proceeds derived from the Chesapeake sales and by preventing TRO-X from acquiring its share of the Interests. TRO-X also alleged that Eagle breached its fiduciary duty by failing to share with TRO-X the benefits obtained in the Chesapeake sales. The trial court granted summary judgment in Eagle's favor on the fiduciary-duty claim.

While the Midland suit was pending, TRO-X's counsel sent Eagle's counsel an "Election of Remedies Notice" stating that "TRO-X intends to seek monetary damages for [Eagle's] breaches . . . . Therefore, assignments of any interests related to this litigation will not be accepted." The record indicates that when the suit went to trial, the leases that were the subject of the Chesapeake sales had not generated any royalty income.

The Midland suit proceeded to trial on TRO-X's contract claims, and the jury found in pertinent part that Eagle failed to comply with the Agreement in several ways, including by "preventing TRO-X from acquiring its proportionate share of the overriding royalty interest and working interest back-in acquired in the sale to Chesapeake." The jury awarded TRO-X $7,680,000 in damages, representing TRO-X's lost profits.[4]

After trial, the trial court determined that TRO-X was entitled to $379,788.80 under the previous court-ordered accounting (after deducting TRO-X's share of expenses), and TRO-X

---

[4] The jury also found $4,380,000 in damages representing the fair market value of the interests, but TRO-X elected to recover its lost profits. Further, the jury found that Eagle Partners tortiously interfered with the Agreement but awarded no damages on that claim.

elected to recover under the jury verdict rather than the accounting. The trial court rendered judgment on the jury's verdict.

The Eastland Court of Appeals reversed. *Eagle I*, 416 S.W.3d at 150. In the court of appeals, Eagle argued in part that the evidence was legally insufficient to support the jury's finding that Eagle prevented TRO-X from acquiring its share of the Interests because TRO-X "had always held equitable title to" those Interests. *Id.* at 148–49. Specifically, Eagle argued in its appellate brief:

> Critically, as TRO-X acknowledged, [TRO-X] has always held "equitable title" to these non-cash proceeds—*i.e.*, the right "to have the legal title to real estate, or the fruits thereof, transferred to the owner of the right." Because TRO-X, in fact, has always owned a share of these sales proceeds as a matter of law, Eagle did not (and could not) "prevent[] TRO-X from acquiring its proportionate share of [non-cash proceeds] acquired in the sale to Chesapeake," as [the jury question] required TRO-X to prove.

(Internal citations omitted) (second and third alterations in original). The court of appeals agreed with Eagle's position, concluding: "Because TRO-X always held equitable title to [the Interests], Eagle Oil could not, as a matter of law, deprive TRO-X of them. . . . [T]he evidence [thus] conclusively establishes that Eagle Oil did not deprive TRO-X of the [I]nterests." *Id.* at 149. The court rendered judgment that TRO-X take nothing on its contract claims and that TRO-X recover $379,788.80 under the accounting the trial court had approved. *Id.* at 150.

TRO-X moved for rehearing, requesting in part that the court of appeals either modify its judgment to reflect that TRO-X was entitled to receive record title to its portion of the Interests held by Eagle or remand to the trial court for further proceedings on that issue. *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 427 S.W.3d 580, 580 (Tex. App.—Eastland 2014, pet. denied). The court of

appeals denied the motion, noting that "TRO-X did not seek record title of these interests [at trial] and that TRO-X's pleadings would not support such a judgment." *Id.*

TRO-X filed a petition for review in this Court, which we denied. We also denied TRO-X's motion for rehearing. On February 8, 2016, while the motion for rehearing was pending, TRO-X filed the present suit in Dallas but requested that it be abated pending the outcome of the proceedings in this Court, asserting that TRO-X would nonsuit the case if we awarded TRO-X legal title or reinstated the jury's damages award in the Midland suit. After we denied rehearing in the Midland suit, the parties proceeded with the present suit.

In its petition in this suit, TRO-X seeks a declaratory judgment and asserts claims for breach of contract and breach of fiduciary duty premised in pertinent part on its "equitable title" to the Interests retained in the Chesapeake sales, as recognized by the court of appeals in *Eagle I*, and Eagle's alleged failure to remit to TRO-X any of the benefits—i.e., production income— derived from those Interests. TRO-X brought additional claims that have been abandoned on appeal, and TRO-X has affirmatively stated that it seeks to preserve and pursue only (1) its claim for a declaratory judgment that it "is entitled to receive all post Midland trial benefits received by Eagle that derive from" the portion of the Interests to which TRO-X holds equitable title (which TRO-X refers to as its "equitable interests") and (2) its claims for breach of contract and breach of fiduciary duty premised on Eagle's failure to remit the income derived from TRO-X's equitable interests on or after February 8, 2012 (four years before this suit was filed).

Eagle filed a motion for summary judgment, arguing that TRO-X's claims are barred as a matter of law by the affirmative defenses of res judicata, collateral estoppel, statute of limitations, and waiver. The trial court granted the motion without specifying its grounds and

6

rendered a final judgment dismissing TRO-X's claims and awarding Eagle attorney's fees under the Uniform Declaratory Judgments Act.

The court of appeals reversed, holding that Eagle was not entitled to summary judgment on its various affirmative defenses. 608 S.W.3d 1, 5 (Tex. App.—Dallas 2018). First, as to waiver, the court concluded that Eagle did not establish as a matter of law that TRO-X's statements in the Midland suit were so inconsistent with its current position that they expressed TRO-X's unequivocal intent to waive any future benefits stemming from its equitable title to the Interests. *Id.* at 10–11.

The court of appeals next held that Eagle did not conclusively prove TRO-X's claims were barred by res judicata. *Id.* at 11–16. The court of appeals explained that the claims in the Midland suit revolved around whether the Chesapeake sales deprived TRO-X of its rights in the equitable interests, while the claims in the present suit concern TRO-X's right to share in production from the equitable interests that occurred after the Midland trial. *Id.* at 12–13. Relatedly, the court held that TRO-X's current claims were not ripe during the Midland suit, concluding that no concrete dispute existed while that suit was pending about what would happen if the equitable interests began producing income from oil-and-gas production after the Midland trial. *Id.* at 15–16.

Finally, the court of appeals held that Eagle did not conclusively prove its statute-of-limitations defense because no evidence showed when the leases at issue began producing in commercial quantities; thus, the record did not demonstrate when production payments were

7

withheld from TRO-X.[5]  *Id.* at 18–19.  In light of its reversal of the summary judgment, the court of appeals also reversed the award of attorney's fees.  *Id.* at 19.  We granted Eagle's petition for review.[6]

## II. Standard of Review

We review a trial court's grant of summary judgment de novo.  *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013).  In a traditional motion for summary judgment, the moving party must show that no genuine dispute exists as to any material fact such that the party is entitled to judgment as a matter of law.  TEX. R. CIV. P. 166a(c).  A defendant may obtain summary judgment by conclusively establishing an affirmative defense.  *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010).  We review the summary judgment record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion.  *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007).

## III. Discussion

## A. Res Judicata

The doctrine of res judicata, also known as claim preclusion, bars lawsuits that arise out of the same subject matter as a prior suit when, with the use of diligence, that subject matter could have been litigated in the prior suit.  *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 449 (Tex. 2007) (explaining the transactional approach to res judicata); *Barr v. Resolution Tr. Corp.*, 837 S.W.2d 627, 628 (Tex. 1992).  The doctrine is necessary to "bring an end to litigation, prevent vexatious litigation, maintain stability of court decisions, promote judicial

---

[5] The court of appeals also held that Eagle did not prove collateral estoppel as a matter of law.  608 S.W.3d at 18.  Eagle did not independently brief the collateral estoppel defense in this Court, so we do not address it.

[6] Texas Civil Justice League submitted an amicus brief in support of Eagle's petition.

8

economy, and prevent double recovery." *Daccach*, 217 S.W.3d at 449. "[A] final judgment on an action extinguishes the right to bring suit on the transaction, or series of connected transactions, out of which the action arose." *Barr*, 837 S.W.2d at 631. When determining whether a set of facts forms a transaction, "the determination is to be made pragmatically, 'giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a trial unit conforms to the parties' expectations or business understanding or usage.'" *Id.* (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 24(2) (AM. LAW INST. 1982)). The elements of res judicata are: "(1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims that were raised or could have been raised in the first action." *Daccach*, 217 S.W.3d at 449 (citing *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex. 1996)).

Res judicata cannot bar a claim that was not ripe at the time the first lawsuit was filed. *Compania Financiara Libano, S.A. v. Simmons*, 53 S.W.3d 365, 367 (Tex. 2001). Ripeness, which requires a plaintiff to have a concrete injury before bringing a claim, is a "threshold issue that implicates subject matter jurisdiction." *Patterson v. Planned Parenthood of Houston & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998). "Under the ripeness doctrine, we consider whether, at the time a lawsuit is filed, the facts are sufficiently developed so that an injury has occurred or is likely to occur, rather than being contingent or remote." *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851–52 (Tex. 2000) (citation and internal quotation marks omitted) (emphasis removed).

The party asserting the defense of res judicata has the burden of proving each element of the defense. TEX. R. CIV. P. 94; *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). Here, the parties agree that the first two elements of res judicata are met,[7] but they part ways on the third—whether TRO-X's claims were raised or could have been raised in the Midland suit. We agree with the court of appeals that Eagle has not conclusively shown that res judicata bars TRO-X's claims.

Generally speaking, the Midland suit concerned TRO-X's right to acquire its share of the interests retained in the Chesapeake sales, and this case involves TRO-X's alleged right to receive production income from those interests that had not yet been generated when the Midland suit went to trial. We thus agree with TRO-X that the alleged breaches in the two suits are premised on different conduct occurring at different times. In the Midland suit, TRO-X complained that Eagle had divested TRO-X of the interests to which it claimed it was entitled under the Agreement, including the overriding royalty and back-in working interests Eagle had retained as part of the Chesapeake sales. In the current suit, TRO-X seeks to recover the actual *proceeds* from those interests now that they are producing in commercial quantities. The suit thus concerns Eagle's post-trial actions related to those proceeds and alleges damages that TRO-X did not suffer until after the Midland trial.

Indeed, Eagle successfully argued in the Midland appeal that TRO-X "always held equitable title to" its share of the Interests from the Chesapeake sales, which is why the court of appeals held that Eagle did not deprive TRO-X of its rights in those Interests. *Eagle I*, 416 S.W.3d at 149. As courts recognize in the trust context, the holders of equitable title to property

---

[7] Eagle and TRO-X are parties to both suits, and a final judgment on the merits was issued in the first suit. *See Eagle I*, 416 S.W.3d at 150.

"are considered the real owners," and the trustee vested with legal title "holds [the property] for the benefit of" the equitable-title holder. *Bradley v. Shaffer*, 535 S.W.3d 242, 248 (Tex. App.— Eastland 2017, no pet.); *see also United States v. Davidson*, 139 F.2d 908, 910 (5th Cir. 1943) ("In Texas, as elsewhere, an equitable title is a right, enforceable in equity, to have the legal title to real estate, *or the fruits thereof*, transferred to the owner of the right.") (emphasis added). It is true that, in the Midland suit, TRO-X could have sought to compel an assignment of legal title to the Interests and chose to seek damages instead. However, Eagle fails to explain how TRO-X's failure to compel the transfer of legal title extinguished any continuing obligation Eagle may have had to account for the income generated by the Interests, to which TRO-X has "always held equitable title." Eagle also fails to explain how TRO-X could have included claims in the Midland suit premised on Eagle's failure to distribute income generated from the Interests when no such income had yet been generated.

Instead, Eagle argues that the Agreement "did not provide for the parties to share any future royalty or production proceeds generated by" the Interests, "[n]or did it require Eagle to hold property interests for TRO-X in perpetuity, collect and pay production or royalty proceeds to TRO-X, act as TRO-X's fiduciary, or serve as an operator." In other words, Eagle disputes the merits of TRO-X's claims, arguing that it has not breached the Agreement or any fiduciary duties by failing to remit production income to TRO-X. But Eagle did not move for summary judgment on those grounds. *Stiles v. Resolution Tr. Corp.*, 867 S.W.2d 24, 26 (Tex. 1993) ("[A] summary judgment cannot be affirmed on grounds not expressly set out in the motion or response."). TRO-X may or may not prevail on its claims, but we agree with the court of appeals that they were not ripe until after the Midland trial concluded. *See Gibson*, 22 S.W.3d at 852 ("A

11

case is not ripe when determining whether the plaintiff has a concrete injury depends on contingent or hypothetical facts, or upon events that have not yet come to pass.").[8]

Finally, we reject Eagle's contention that allowing TRO-X's claims to proceed amounts to the creation of "a claim-splitting exception [to res judicata] for suits involving income-producing property" that "undermine[s] the finality of judgments." Again, the allegations in the Midland suit and this suit involve substantively different breaches occurring at different times and causing different legal injuries. Whatever obligation Eagle may have owed to TRO-X with respect to income generated by the Interests in light of TRO-X's status as an equitable-title holder was not extinguished by the Midland suit.[9] Because Eagle has not conclusively established that TRO-X's claims in this suit either were brought or could have been brought in the Midland suit, Eagle is not entitled to summary judgment on res judicata grounds.

### B. Statute of Limitations

TRO-X's claims for breach of contract, breach of fiduciary duty, and a declaratory judgment are all governed by a four-year statute of limitations. *See* TEX. CIV. PRAC. & REM. CODE §§ 16.004(a)(5) (breach of fiduciary duty), .051 (residual four-year limitations period); *Nw. Austin Mun. Util. Dist. No. 1 v. City of Austin*, 274 S.W.3d 820, 836 (Tex. App.—Austin 2008, pet. denied) ("Because a declaratory judgment action is a procedural device used to vindicate substantive rights, it is generally governed by the statute of limitations for the legal remedy underlying the claim[.]"). The limitations period on a cause of action begins to run "when a wrongful act causes some legal injury, even if the fact of injury is not discovered until

---

[8] Indeed, as discussed further *infra*, the court of appeals effectively determined in the Midland suit that TRO-X had not suffered a legal injury because its equitable title to the Interests remained intact. *See id.* at 149. The legal injury TRO-X claims here could not have been suffered before the Interests began generating income.

[9] As noted, we express no opinion on whether Eagle breached any contractual or fiduciary duties.

12

later, and even if all resulting damages have not yet occurred." *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996). In turn, a legal injury "can give rise to a cause of action because it is an invasion of a plaintiff's legal rights." *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 594 (Tex. 2016); *see also Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 202 (Tex. 2011) ("Causes of action accrue and statutes of limitations begin to run when facts come into existence that authorize a claimant to seek a judicial remedy."). To obtain summary judgment on limitations grounds, the movant must conclusively establish the accrual date of the cause of action. *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005).

The court of appeals held that TRO-X's claims accrued when Eagle's related alleged breaches (withholding of production income from the Interests) occurred, and that Eagle presented no summary judgment evidence establishing that accrual date. 608 S.W.3d at 18. Eagle maintains that all of TRO-X's claims in this suit accrued no later than June 2008—when Eagle completed the Chesapeake transaction, reserved the Interests, and did not assign TRO-X legal title to its share of the Interests. Eagle asserts that the "fact that production proceeds had not yet 'occurred' at the time of the Midland trial makes no difference to the accrual of TRO-X's claims" because those proceeds "are *not* the legal injury" but "are, at best, one form of the 'resulting damages' from Eagle's alleged failure to assign the Interests to TRO-X in 2008." Eagle goes on to argue that under the court of appeals' reasoning, a car-accident victim may not sue to recover future medical expenses until those expenses are actually incurred. We disagree.

As discussed, the court of appeals in the Midland suit held that because TRO-X "always held equitable title" to its share of the Interests, Eagle did not deprive TRO-X of those Interests regardless of whether Eagle failed to assign them. *Eagle I*, 416 S.W.3d at 149. And if TRO-X

13

was not deprived of its Interests, as Eagle successfully asserted in the Midland appeal, then Eagle breached no duty and TRO-X suffered no legal injury. The alleged breach and injury here stem from Eagle's failure to remit TRO-X's share of the production income derived from the Interests, and neither the wrongdoing nor the injury could have occurred until there was production income to withhold. By contrast, Eagle's hypothetical car accident involves a single instance of wrongdoing—negligence in causing the accident—resulting in a single invasion of the plaintiff's legal rights. All of the resulting medical expenses stem from that invasion and thus constitute additional damages but not separate legal injuries.

In arguing that TRO-X's claims could not have accrued after June 2008, Eagle also reiterates its assertion that it has no ongoing obligation to remit production payments to TRO-X; thus, Eagle contends, no cause of action may accrue under that invalid theory. But again, whether TRO-X may ultimately recover on the merits of its claims is distinct from whether Eagle has conclusively established its affirmative defenses, and Eagle's motion for summary judgment is premised solely on those defenses. Because Eagle has not established as a matter of law that TRO-X's claims accrued more than four years before it filed suit, Eagle is not entitled to summary judgment on limitations grounds.

Alternatively, Eagle argues that even if TRO-X filed suit within the limitations period, its claims are nevertheless barred because TRO-X failed to exercise diligence in serving Eagle with citation. *See Gant v. DeLeon*, 786 S.W.2d 259, 260 (Tex. 1990) ("When a plaintiff files a petition within the limitations period, but does not serve the defendant until after the statutory period has expired, the date of service relates back to the date of filing if the plaintiff exercised diligence in effecting service."). Eagle raises this argument by "indulging the fiction that

14

limitations did not begin to run until February 17, 2012." However, Eagle has not shown that TRO-X's claims accrued on February 17, 2012, or any other date. Accordingly, we need not address whether TRO-X's diligence in serving Eagle rendered its suit untimely.

### C. Waiver

Finally, Eagle asserts that TRO-X's claims are conclusively barred by waiver. Waiver occurs when a party intentionally relinquishes a known right or engages in conduct inconsistent with claiming that right. *LaLonde v. Gosnell*, 593 S.W.3d 212, 218–19 (Tex. 2019); *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996). Waiver need not be explicit, but intent to waive a right may be implied by conduct only "if, in light of the 'surrounding facts and circumstances,' it is 'unequivocally inconsistent with claiming' that right." *LaLonde*, 593 S.W.3d at 219 (quoting *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 393 (Tex. 2014); *Van Indep. Sch. Dist. v. McCarty*, 165 S.W.3d 351, 353 (Tex. 2005)); *see also Shannon v. Mem'l Drive Presbyterian Church U.S.*, 476 S.W.3d 612, 627 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) ("Intent to waive must be clear, decisive, and unequivocal."). Waiver is generally a question of fact but "becomes one of law" "when the facts and circumstances are admitted or clearly established." *Crosstex Energy*, 430 S.W.3d at 394 (citation and internal quotation marks omitted).

Eagle relies on certain statements TRO-X made during the Midland suit to support Eagle's waiver defense. As noted, during that suit, TRO-X's attorney sent Eagle an "Election of Remedies" letter stating that TRO-X intended to seek monetary damages, so "assignments of any interests related to [the Midland] litigation [would] not be accepted." Additionally, a representative of TRO-X testified about the letter, stating that TRO-X would not accept

assignments of interests under the Agreement as a remedy because it "didn't want them anymore." Eagle argues that TRO-X thereby intentionally relinquished any right to recover benefits stemming from those interests. The court of appeals rejected that argument, concluding that it "takes TRO-X's Midland suit statements out of that case's context and tries to apply them to the different context presented here." 608 S.W.3d at 10. We agree with the court of appeals.

TRO-X based its pertinent allegations and claims in the Midland suit on the premise that it had been deprived of the Interests entirely, and it sought damages as a remedy, rather than an assignment, based on the value of those Interests at the time. The above-referenced statements were made in the course of litigating those claims, which ultimately concluded with the court of appeals' holding that TRO-X had *not* been deprived of its equitable title to the Interests. Considered in context, the statements do not establish, and certainly do not do so unequivocally, that TRO-X intended to relinquish all rights stemming from the equitable title that it still held. Rather, as TRO-X argues, its actions in both suits are consistent with its "ultimate goal" of being made whole. Eagle has not conclusively established its waiver defense.

### D. Attorney's Fees

The trial court awarded attorney's fees to Eagle in light of its successful pursuit of summary judgment on TRO-X's declaratory judgment claims. TEX. CIV. PRAC. & REM. CODE § 37.009 (authorizing the court to "award costs and reasonable and necessary attorney's fees as are equitable and just" in a declaratory judgment action). The court of appeals reversed, holding that "the attorney's fees award may no longer be equitable and just" considering that court's reversal of summary judgment. 608 S.W.3d at 19.

Eagle contends that we should reinstate the fee award because (1) the trial court's summary judgment was correct and (2) TRO-X appealed only one of the four declarations on which the trial court rendered judgment. As discussed, however, we agree with the court of appeals' reversal of summary judgment on the declaration that TRO-X did appeal. Whether an award of attorney's fees remains "equitable and just" in light of any unappealed rulings is a matter for the trial court to address on remand.

### IV. Conclusion

The court of appeals correctly reversed the trial court's judgment because Eagle did not conclusively establish the affirmative defense of res judicata, statute of limitations, or waiver. Accordingly, we affirm the court of appeals' judgment and remand the case to the trial court for further proceedings.

_____
Debra H. Lehrmann
Justice

**OPINION DELIVERED:** March 19, 2021

17